### In re TIME WARNER INC. SECURITIES LITIGATION.

ZVI TRADING CORP. EMPLOYEES' MONEY PURCHASE PENSION PLAN AND TRUST, and Barry Zonon, Plaintiffs–Appellants,

v.

Steven J. ROSS, N.J. Nicholas, Jr., Gerald M. Levin, Bert W. Wasserman, and Time Warner Inc., Defendants–Appellees.

No. 836, Docket 92–7816.

United States Court of Appeals, Second Circuit.

Argued Jan. 29, 1993.

Decided Nov. 30, 1993.

Arthur R. Miller, Cambridge, MA (David J. Bershad, Sol Schreiber, Lee S. Shalov, James E. Tullman, Milberg Weiss Bershad, Specthrie & Lerach, New York City, Michael J. Freed, Joseph D. Ament, Ellyn M. Lansing, Much Shelist Freed Denenberg & Ament, Chicago, IL, Roger W. Kirby, Kaufman Malchman Kaufmann & Kirby, New York City, on the brief), for plaintiffs-appellants.

Stuart Robinowitz, New York City (Jonathan J. Freedman, Matthew L. Levine, Paul, Weiss, Rifkind, Wharton & Garrison, on the brief), for defendants-appellees.

Before NEWMAN, Chief Judge, WINTER and MINER, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal from the dismissal of a securities fraud complaint requires us to consider the recurring issue of whether stock fraud claims are sufficiently pleaded to warrant at least discovery and perhaps trial. Three separate issues are presented: (1) whether a corporation has a duty to update somewhat optimistic predictions about achieving a business plan when it appears that the plan might not be realized, (2) whether a corporation has a duty to disclose a specific alternative to an announced business plan when that alternative is under active consideration, and (3) whether a corporation is responsible for statements in newspapers and security analyst reports that are attributed to unnamed corporate personnel. These issues arise on an appeal by plaintiffs ZVI Trading Corporation Employees' Money Purchase Pension Plan and Trust and Barry Zolon from the June 1, 1992, order of the District Court for the Southern District of New York (Morris E. Lasker, Judge) dismissing plaintiffs' complaint, 794 F.Supp. 1252 (S.D.N.Y.1992), and

the July 16, 1992, order denying plaintiffs' motion for reconsideration.

Plaintiffs' complaint alleged that defendant Time Warner, Inc. and four of its officers had misled the investing public by statements and omissions made in the course of Time Warner's efforts to reduce its debt. The District Court dismissed the complaint with prejudice for failure to adequately plead material misrepresentations or omissions attributable to the defendants and for failure to adequately plead scienter. We hold that the complaint's allegations of scienter and certain of its allegations concerning omissions are adequate to survive a motion to dismiss, and we accordingly reverse the order of dismissal and remand.

## Background

On June 7, 1989, Time, Inc. received a surprise tender offer for its stock from Paramount Communications. Paramount's initial offer was $175 per share, in cash, and was eventually increased to $200 per share. *See Paramount Communications, Inc. v. Time Inc.*, 571 A.2d 1140, 1147–49 (Del.1989). Time's directors declined to submit this offer to the shareholders and continued discussions that had begun somewhat earlier concerning a merger with Warner Communications, Inc. Eventually, Time and Warner agreed that Time would acquire all of Warner's outstanding stock for $70 per share, even though this acquisition would cause Time to incur debt of over $10 billion. Time shareholders and Paramount were unsuccessful in their effort to enjoin the Warner acquisition, which was completed in July 1989.

Thus, in 1989, Time Warner Inc., the entity resulting from the merger, found itself saddled with over $10 billion in debt, an outcome that drew criticism from many shareholders. The company embarked on a highly publicized campaign to find international "strategic partners" who would infuse billions of dollars of capital into the company and who would help the company realize its dream of becoming a dominant worldwide entertainment conglomerate. Ultimately, Time Warner formed only two strategic partnerships, each on a much smaller scale than had been hoped for. Faced with a multi-billion dollar balloon payment on the debt, the company was forced to seek an alternative method of raising capital—a new stock offering that substantially diluted the rights of the existing shareholders. The company first proposed a variable price offering on June 6, 1991. This proposal was rejected by the SEC, but the SEC approved a second proposal announced on July 12, 1991. Announcement of the two offering proposals caused a substantial decline in the price of Time Warner stock. From June 5 to June 12, the share price fell from $117 to $94. By July 12, the price had fallen to $89.75.

The plaintiff class, which has not yet been certified, consists of persons who bought Time Warner stock between December 12, 1990, and June 7, 1991. Their complaint, containing causes of action under sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) (1988), and state law, alleges that a series of statements from Time Warner officials during the class period were materially misleading in that they misrepresented the status of the ongoing strategic partnership discussions and failed to disclose consideration of the stock offering alternative. The parties have classified the challenged statements into two categories: (1) press releases and public statements from the individual defendants, and (2) statements to reporters and security analysts emanating from sources within the company but not attributed to any identified individual. The statements, which we discuss in more detail below, consist of generally positive messages concerning the progress of the search for strategic partners, and imply to varying degrees that significant partnerships will be consummated and announced in the near future. None of the statements acknowledged that negotiations with prospective partners were going less well than expected or that an alternative method of raising capital was under consideration.

Plaintiff ZVI Trading filed its complaint on June 14, 1991, and amended the complaint on June 19 to add one additional defendant, to expand the class period, and to supplement the list of alleged misstatements. Plaintiff Barry Zolon filed a complaint on June 24,

1991. Plaintiffs made discovery requests in June and July, and defendants moved on August 21 for a protective order pending resolution of an anticipated motion to dismiss. Defendants' motion papers argued in part that the complaint was inadequate. The District Court granted the protective order motion in part, limiting plaintiffs' discovery to documents produced in an unrelated Delaware action that challenged the terms of the rights offering. Pursuant to a stipulated order, plaintiffs filed on August 30 a consolidated complaint that responded to some of the deficiencies defendants had complained of in their protective order motion. On October 11, defendants moved to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Relying on both rules, the District Court granted the motion and denied plaintiffs leave to amend the complaint.

The District Court's opinion considered the two categories of misstatements in turn. As to the first category—attributed public statements by the individual defendants or the corporation—the Court agreed that defendants attempted to drum up enthusiasm for strategic partnerships and did not disclose either their difficulties in pursuing that course or the possibility of a stock offering. But the Court found that the statements were accurate when made, and that later events did not give rise to a duty to correct or update the statements. The Court also concluded that plaintiffs had not adequately pled scienter under any theory. As to the second category of statements, the Court ruled that Rule 9(b) required plaintiffs to allege the identity of the speakers. The Court further concluded that the defendants could not be held responsible for any of the unattributed statements and that in any event the statements were not actionable for the same reasons that the attributed statements were not actionable. The Court then dismissed plaintiffs' pendent state claims of common law fraud and negligent misrepresentation on the merits. Finally, the Court concluded that leave to replead should not be granted, since the defects went to the merits and were not mere pleading niceties.[1]

## Discussion

Cases of this sort present an inevitable tension between two powerful interests. On the one hand, there is the interest in deterring fraud in the securities markets and remedying it when it occurs. That interest is served by recognizing that the victims of fraud often are unable to detail their allegations until they have had some opportunity to conduct discovery of those reasonably suspected of having perpetrated a fraud. Consistent with that interest, modern pleading rules usually permit a complaint to survive dismissal unless, in the familiar phrase, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

On the other hand, there is the interest in deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal, even though no recovery would occur if the suit were litigated to completion. It has never been clear how these competing interests are to be accommodated, and the adjudication process is not well suited to the formulation of a universal resolution of the tensions between them. In the absence of a more refined statutory standard than the vague contours of section 10(b) or a more detailed attempt at rulemaking than the SEC has managed in Rule 10b–5, despite 50 years of unavailed opportunity, courts must adjudicate the precise cases

---

1. Judge Lasker's dismissal order was never embodied in a judgment, in apparent disregard of the separate document rule, Fed.R.Civ.P. 58. Nonetheless, we can treat the dismissal order as a final decision for purposes of 28 U.S.C. § 1291, since lack of compliance with the separate document rule is a waivable defect, and no party has complained. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 384, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978) (per curiam). Treating the June 1, 1992, order as final, we also find that the appeal was timely filed. Plaintiffs moved for reargument on June 15, 1992, within the ten-day period, as calculated under Fed.R.Civ.P. 6(a), allowed for a motion under Fed.R.Civ.P. 59(e). Notice of appeal was filed within 30 days of denial of this motion, bringing up for appeal the June 1, 1992, final decision. *See* Fed.R.App.P. 4(a)(4).

before them, striking the balance as best they can.

In doing so, we do well to recognize several consequences of this common law approach to what is supposed to be a statutory standard. First, our outcomes will not necessarily evolve a discernible pattern. Second, the absence of a clear pattern will inevitably create uncertainty in the fields of both securities and litigation. Third, however sensitively we strike the balance in a particular case, we will not avoid the risks of adverse consequences: in the aftermath of any ruling that upholds the dismissal of a 10b–5 suit, there will be some opportunity for unremedied fraud; in the aftermath of any ruling that permits a 10b–5 suit to progress beyond a motion to dismiss, there will be some opportunity to extract an undeserved settlement. Unattractive as those prospects are, they neither indicate a sound basis for decision nor permit avoidance of decision.

To state a cause of action under Rule 10b–5, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). The shortcomings of the complaint identified by the District Court were the failure to identify a false material representation or material undisclosed information, and the failure to adequately plead scienter. We find it convenient to consider first the so-called unattributed statements before turning to those for which Time Warner acknowledges responsibility.

## I. Existence of an actionable misrepresentation or omission

### A. Anonymous statements to reporters and analysts

■ We first consider whether the District Court properly concluded that Rule 9(b) required dismissal of allegations of fraudulent statements when the complaint failed to identify the speaker. The complaint contains excerpts from a variety of newspaper stories and security analyst reports. Some of these accounts contain anonymous quotes or paraphrases of statements from alleged Time Warner insiders. Others merely report upon Time Warner's activities. In both cases, plaintiffs allege that some as yet unknown agents of Time Warner made misleading statements (or omitted to disclose material information) in discussions with the reporter or analyst. These reports and stories, excerpted in the complaint at ¶¶ 42, 44–47, 49, 54, 58–62, 65, 69, 72, generally confirm that negotiations concerning strategic alliances are ongoing and add little to the statements for which Time Warner is concededly responsible. But some of the statements implied in the reports and stories would bolster plaintiffs' case considerably. We have included the relevant excerpts in the margin.[2]

---

**2.** 1. Time Warner has "indicated that it has had serious negotiations concerning the sale of an interest in some of its cable systems ... and continues to explore joint ventures with Japanese, European, and U.S. companies which would help [Time Warner] reduce its debt." (Merrill Lynch, Oct. 23, 1990). Third Amended Complaint ¶ 44.

2. Time Warner "management is working on a fairly dramatic restructuring involving joint venture partners and substantial downpayment of debt. Such a move could eliminate the leverage worries for the stock and highlight values." (Smith Barney, Oct. 31, 1990). *Id.* ¶ 47.

3. Time Warner appeared to be moving closer to completing a strategic alliance. Ross and Nicholas had been "globetrotting since last year talking to potential partners." (Wall Street Journal, Feb. 13, 1991) (portion of quotation is paraphrased in complaint). *Id.* ¶ 58.

4. "[W]e assign a high probability to a restructuring within a year...." (Donaldson Lufkin & Jenrette buy recommendation, Feb. 13, 1991). *Id.* ¶ 69(i).

5. Time Warner has "said all along we are interested in the concept of international partnership, and we have been talking with many interested parties.... Now we are in the process of selecting from among them those that share our vision." (Time Warner spokesman, Feb. 15, 1991). *Id.* ¶ 59.

6. "We continue to expect an asset sale, joint venture or other major restructuring some time this year." (Wertheim Schroeder buy recommendation, Feb. 15, 1991). *Id.* ¶ 69(ii).

7. Time Warner expected to complete one or more transactions in 1991. (Paraphrase of alleged statement by Time Warner at security analysts meeting, Feb. 20, 1991). *Id.* ¶ 60.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or malice shall be stated with particularity." Judge Lasker understood Rule 9(b) to require, at a minimum, that the plaintiff identify the speaker of the allegedly fraudulent statements. We believe that he was correct. Plaintiffs rely on several district court decisions that they claim apply a less strict rule for statements attributed to corporate "spokespersons," *see In re Ann-Taylor Stores Securities Litigation*, 807 F.Supp. 990, 1004 (S.D.N.Y.1992); *Cytryn v. Cook*, Fed.Sec.L.Rep. (CCH) ¶ 95,409, 1990 WL 128233 (N.D.Cal. July 2, 1990), and for statements by newspapers and analysts allegedly caused by corporate employees, *see Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 603 (N.D.Cal.1991); *In re Columbia Securities Litigation*, 747 F.Supp. 237, 245 (S.D.N.Y.1990). These cases are distinguishable on their facts, in that they involve official press releases, *see AnnTaylor*, 807 F.Supp. at 1004–05; *see also DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) (offering statement), statements by named individuals to analysts or reporters, *see Columbia*, 747 F.Supp. at 245; *Cytryn*, Fed.Sec.L.Rep. (CCH) at 97,016, or the defendant's placing its "imprimatur" on analyst's reports, *see Alfus*, 764 F.Supp. at 603; *see also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163–64 (2d Cir.1980). None of these cases sanctions the pleading of fraud through completely unattributed statements, even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant.

Just as 10b–5 litigation, however resolved, risks adverse consequences, as we have noted, a strict application of Rule 9(b) in the context of unattributed statements also risks unfortunate effects. A scheming corporation could inflate its stock price through fraudulent statements whispered to reporters or analysts. If the reporters or analysts refused to reveal their sources and if no one inside the corporation leaked to the stockholders or to regulators the identity of the speakers, the corporation would have perpetuated a fraud that could not be remedied by a private civil action under the federal securities laws. For several reasons, however, we have some confidence that this is not a sufficiently likely scenario to justify a rule that would permit a suit alleging unattributed statements to survive a motion to dismiss.

As an initial matter, the function of financial reporters and security analysts is to determine the truth about the affairs of publicly traded companies. Few reporters or analysts would knowingly abet a fraud, and many will detect and reveal a corporation's efforts to use them as a channel for fraudulent statements. Additionally, investors tend to discount information in newspaper articles and analyst reports when the author is unable to cite specific, attributable information from the company. Thus, the opportunity to manipulate stock prices through the planting of false stories is somewhat limited. Finally, the effect of a less strict construction of Rule 9(b) would be only to allow discovery on the issue of the linkage between the corporation and the newspaper stories or analyst reports. Sometimes, of course, plaintiff's counsel would be able to use discovery to determine the identity of the speaker, and would find that this speaker was a person for whom the corporation was responsible. But far more often, we suspect, this would not be the case. Either the corporation is not responsible for the statements, in which case it has been unnecessarily burdened either by the expense of discovery or by a settlement extracted under threat of such discovery, or it is responsible, and having exhibited sufficient

---

8. "Working aggressively, [Time Warner] expects to complete a deal in 1991." (Wertheim Schroeder, Feb. 20, 1991). *Id.* ¶ 69(iii).

9. Time Warner executives said they were "in the process of selecting partners from among many prospects they have met." (Wall Street Journal, Feb. 21, 1991). *Id.* ¶ 61.

10. Talks had "intensified." (Time Warner spokesman, quoted in the "press," Apr. 19, 1991). *Id.* ¶ 65.

11. Talks had intensified and there should be a definitive announcement by year-end. (Wertheim Schroeder, Apr. 19, 1991). *Id.* ¶ 69(ix).

12. The "company has been saying and continues to say that discussions to form partnerships are ongoing." (Time Warner spokesman, June 5, 1991). *Id.* ¶ 72.

devotion to a fraudulent scheme so as to prevent attribution of statements in advance of discovery, it will often attempt and sometimes succeed in stonewalling discovery.

Alternatively, the District Court found that the unattributed statements, even if attributable to Time Warner, were not actionable. We do not reach this issue, since we find that dismissal with prejudice under Fed.R.Civ.P. 9(b) was proper as to these statements. It is true that dismissal under Rule 9(b) is usually without prejudice, *see Luce v. Edelstein,* 802 F.2d 49, 56–57 (2d Cir.1986), but plaintiffs, though offered the opportunity by the District Court, have presented nothing to suggest that they could amend the complaint to adequately plead a link between the defendants and the unattributed statements.

B. Attributed statements and corporate press releases

We next focus on those statements as to which there is no issue of attribution. While plaintiffs claim that these statements were misleading, in that they exaggerated the likelihood that strategic alliances would be made, plaintiffs primarily fault these statements for what they did not disclose. The nondisclosure is of two types: failure to disclose problems in the strategic alliance negotiations,

and failure to disclose the active consideration of an alternative method of raising capital. We have listed excerpts of the relevant statements in the margin.[3]

■ 1. *Affirmative misrepresentations.* We agree with the District Court that none of the statements constitutes an *affirmative* misrepresentation. Most of the statements reflect merely that talks are ongoing, and that Time Warner hopes that the talks will be successful. There is no suggestion that the factual assertions contained in any of these statements were false when the statements were made. As to the expressions of opinion and the projections contained in the statements, while not beyond the reach of the securities laws, *see Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, ——–——, 111 S.Ct. 2749, 2756–61, 115 L.Ed.2d 929 (1991) (proxy statements actionable under section 14(a)); *Goldman v. Belden,* 754 F.2d 1059, 1068–69 (2d Cir.1985) (positive predictions actionable under section 10(b)), the complaint contains no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis in fact.

**3.** 1. "This company is worth a hell of a lot more than $200.00 a share. It was then. It is now." (Wall Street Journal, Feb. 7, 1990) (quoting defendant Levin). Third Amended Complaint, ¶ 41.

2. "There may be four big industrial partners with one in Europe and two in Japan, or two in Europe and two in Japan and [an] American company." (Wall Street Journal, Nov. 1990) (exact date unspecified) (quoting defendant Ross). *Id.* ¶ 51.

3. The company would seek foreign investors to take a minority interest in subsidiaries as a means of alleviating debt without selling off assets. (Time Warner announcement, Nov. 19, 1990) (no direct quotation provided). *Id.* ¶ 48.

4. The company "continues to have serious talks that could lead to the sale of five or six separate minority stakes in its entertainment subsidiaries next year." (Wall Street Journal, Nov. 30, 1990) (quoting defendant Ross). *Id.* ¶ 50.

5. The company "received and continue[s] to receive many expressions of interest in forming joint ventures of all of its businesses from all over the world." (Time Warner press release, Dec. 3, 1990). *Id.* ¶ 52.

6. "Management of Time Warner also has had discussions with potential partners on the

mutual advantages of strategic alliances formed at the subsidiary level." (1990 SEC 10-K Statement). *Id.* ¶ 56.

7. Ross and Nicholas "are excited by the possibilities for growth that will increase shareholder value, especially through strategic partnerships." (1990 Annual Report). *Id.* ¶ 57.

8. The company "was in talks with possible buyers of stakes in some of its entertainment businesses." (Ross, March 7, 1991). *Id.* ¶ 63.

9. Time Warner "was continuing talks with potential foreign partners.... We're not selling or buying.... We're partnering." (Nicholas, Mar. 15, 1991). *Id.*

10. Time Warner is "currently engaged in nearly two dozen discussions in Europe and Asia that could link most of the world's entertainment and media companies in a complex web of relationships.... We are making alliances at the subsidiary level with the partners keeping their national identities and bringing their respective strengths to bear." (Business Week, May 13, 1991) (quoting defendant Ross). *Id.* ¶ 66

11. "[W]e are pursuing a number of innovative business ventures all over the world." (Time Warner public announcement, May 14, 1991). *Id.* ¶ 68.

2. *Nondisclosure of problems in the strategic alliance negotiations.* The allegations of nondisclosure are more serious. Plaintiffs' first theory of nondisclosure is that the defendants' statements hyping strategic alliances gave rise to a duty to disclose problems in the alliance negotiations as those problems developed. We agree that a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events. *See In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 745–49 (S.D.N.Y.1989) (material misstatements or omissions adequately set forth alleging that defendants had expressed a strong interest in consummating a merger and had not disclosed a later "change of heart"); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 752 (S.D.N.Y.1985) (approving settlement), *aff'd,* 798 F.2d 35 (2d Cir.1986). But, in this case, the attributed public statements lack the sort of definite positive projections that might require later correction. The statements suggest only the hope of any company, embarking on talks with multiple partners, that the talks would go well. No identified defendant stated that he thought deals would be struck by a certain date, or even that it was likely that deals would be struck at all. *Cf. In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1118–19 (9th Cir.1989) (Chairman of the Board stated that new computer product would be "phenomenally successful the first year out of the chute," etc.), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). These statements did not become materially misleading when the talks did not proceed well.[4]

3. *Nondisclosure of alternative methods of raising capital.* Still more serious is the allegation of a failure to disclose the simultaneous consideration of the rights offering as an alternative method of raising capital. As an initial matter, of course, a reasonable investor would probably have wanted to know of consideration of the rights offering. Though both the rights offering and strategic alliances would have brought capital into the corporation, the two acts would have directly opposite effects on the price of Time Warner stock. A successful strategic alliance, simultaneously opening new markets and reducing debt, would have improved the corporation's expected profit stream, and should have served to drive up the share price. An offering of new shares, in contrast, would dilute the ownership rights of existing shareholders, likely decrease dividends, and drive down the price of the stock.

But a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. *See Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988); *Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2d Cir.1992). As Time Warner pointedly reminds us, we have not only emphasized the importance of ascertaining a duty to disclose when omissions are at issue but have also drawn a distinction between the concepts of a duty to disclose and materiality. *See Glazer,* 964 F.2d at 157. It appears, however, that the distinction has meaning only in certain contexts. For example, where the issue is whether an individual's relationship to information imposed upon him a duty to disclose, the inquiry as to his duty is quite distinct from the inquiry as to the information's materiality. *See Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). On the other hand, where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce. The undisclosed information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as

---

4. Although the statements are generally open-ended, there is one sense in which they have a solid core. The statements represent as fact that serious talks with multiple parties were ongoing. If this factual assertion ceased to be true, defendants would have had an obligation to update their earlier statements. But the complaint does not allege that the talks ever stopped or ceased to be "serious," just that they eventually went poorly.

having significantly altered the 'total mix' of information available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). If a reasonable investor would so regard the omitted fact, it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure. As *Glazer* makes clear, one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading. *Glazer,* 964 F.2d at 157 (citing *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26 (1st Cir.1987)).

We have previously considered whether disclosure of one business plan required disclosure of considered alternatives in *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). In *Kronfeld,* the defendant, TWA's parent corporation, failed to disclose in the prospectus for a new issue of TWA stock that it was contemplating termination of its relationship with TWA. Because the prospectus discussed "in some detail the relationship between TWA" and the parent, *id.* at 735, we held that a fact question was presented as to whether it was materially misleading not to disclose the possibility of termination, *id.* at 736–37. In effect, the alternative, if disclosed, would have suggested to investors that the various guarantees extended from the parent to TWA might be meaningless. In the pending case, the District Court understood the obligation to disclose alternate business plans to be limited to the context of mutually exclusive alternatives. It is true that *Kronfeld* involved such alternatives—the TWA parent could not both maintain and terminate its relations with TWA—and that this case does not. Time Warner potentially could have raised all its needed capital from either strategic alliances or a rights offering, or it could have raised some part of the necessary capital using each approach.

■ We believe, however, that a disclosure duty limited to mutually exclusive alternatives is too narrow. A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements. Time Warner's public statements could have been understood by reasonable investors to mean that the company hoped to solve the *entire* debt problem through strategic alliances. Having publicly hyped strategic alliances, Time Warner may have come under a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light.

■ It is important to appreciate the limits of our disagreement with the District Court. We do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock. Rather, we hold that when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration. Whether consideration of the alternate approach constitutes material information, and whether nondisclosure of the alternate approach renders the original disclosure misleading, remain questions for the trier of fact, and may be resolved by summary judgment when there is no disputed issue of material fact. We conclude here only that the allegations in this complaint of nondisclosure of the rights offering are sufficient to survive a motion to dismiss.

## II. Scienter

■ As an alternative basis for its dismissal order, the District Court found that plaintiffs had failed to adequately plead scienter. Scienter is a necessary element of every 10b–5 action, and though it need not be plead with "great specificity," *Connecticut National Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985)), the facts alleged in the complaint must "give[ ] rise to a 'strong inference' of fraudulent intent." *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991). We have recognized two distinct ways in which a plaintiff may plead scienter without direct knowledge of the defendant's state

of mind. The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so. The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior. *See Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (in banc). The District Court concluded that the complaint fell short under either approach.

A. Motive and opportunity

 The difficulty with plaintiffs' motive and opportunity approach to scienter lies in the pleading of motive; no one doubts that the defendants had the opportunity, if they wished, to manipulate the price of Time Warner stock. Plaintiff's allegations concerning motive have shifted somewhat throughout the proceedings. Initially, plaintiffs emphasized that the defendants had embarked on a campaign to convince the public that Time Warner stock was worth in excess of $200 per share, so as to soften public criticism and avoid personal embarrassment stemming from their blocking of the Paramount tender offer. Plaintiffs now emphasize that defendants were motivated to misrepresent the status of the strategic alliance negotiations to avoid jeopardizing talks with prospective partners, and to withhold disclosure of consideration of the rights offering to maintain a high stock price prior to announcement of the new rights offering in order to lessen the dilutive effect. The complaint alleged the maintenance of an artificially high stock price (Third Amendment Complaint, ¶ 93), but relied on an inference for the motive of lessening the dilutive effect of the ultimately disclosed rights offering. The District Court found these proffered motives facially irrational, since Time Warner had no unilateral ability to cause prospective partners to invest and since, without strategic alliances, a rights offering, which would necessarily depress the stock price, was inevitable. Defendants make similar arguments on appeal; they also claim that these motive theories are too speculative.

Whether plaintiffs' motive allegations, with respect to nondisclosure of the rights offering, are adequate to survive a motion to dismiss is a close question. On the one hand, it is surely true, as the District Court noted, that strategic alliances could not be compelled and that, once the rights offering was announced, the price of Time Warner stock would inevitably drop. On the other hand, it is not clear, at least at this threshold stage of the lawsuit, that the defendants had nothing to gain by playing up strategic alliances while simultaneously keeping secret until the last moment the alleged active consideration of a rights offering. The unresolved issue is whether the effects of the alleged artificial raising of the stock price by the combination of the glowing reports of potential strategic alliances and the nondisclosure of the active consideration of a rights offering could reasonably have been expected by the company not to have been completely dissipated by the announcement of the rights offering, thereby enabling the company to set the rights offering price somewhat higher than would have been possible without the misleading statements and to lessen the dilutive effect of the offering.

Defendants ridicule plaintiffs' motive argument as "nonsensical," Brief for Appellees at 29, by arguing that the misleading statements about possible alliances all preceded the one-month period starting May 1, 1991, in which they are alleged to have been actively considering the rights offering. Thus, defendants contend, plaintiffs are alleging a conspiracy in which all of the overt acts occurred before the May 1 date that marks the start of the conspiracy. This argument is strong on rhetoric but insufficient to preclude all possibility of developing proof that a motive in fact existed. The pre-May 1 statements were not, as we have held, actionable when made. However, they arguably became misleading after May 1 when the rights offering was allegedly under active consideration and not disclosed. The failure to render the prior statements not misleading by disclosing consideration of the rights offering occurred after May 1. The close question is not whether any actionable nondisclosure occurred after May 1; the complaint adequately alleges that it did. The close question is

whether the defendants are adequately alleged to have had a motive to benefit from the nondisclosure, thereby satisfying the scienter requirement.

The defendants are on somewhat sounder ground in faulting the plaintiffs for not articulating with either clarity or consistency their motive theory. Nevertheless, we think that a motive theory emerges with sufficient reasonable possibilities to withstand a motion to dismiss. With all inferences drawn in favor of the plaintiffs, it is arguable that the defendants acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock. This could have happened if (a) the statements about strategic alliances, which became misleading upon nondisclosure of consideration of the rights offering, artificially increased the stock price, and (b) the effect of that increase was not fully dissipated by the announcement of the rights offering.[5] If some artificial enhancement remained, the defendants would have been able to raise the needed capital at a higher rights offering price, thereby issuing fewer shares and lessening the dilutive effect (or raising more capital by issuing the same number of shares).

We recognize that the Supreme Court has proceeded on the assumption that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *See Basic, Inc.*, 485 U.S. at 247, n. 24, 108 S.Ct. at 992, n. 24. Though confidence in the efficient markets hypothesis is not universally shared, *see* Donald C. Langevoort, *Theories, Assumptions, and Securities Regulation: Market Efficiency Revisited*, 140 U.Pa.L.Rev. 851 (1992),[6] we do not intend to permit a scienter allegation to survive dismissal on the vague possibility that some irrational share purchasers might not comprehend disclosures made in the normal course by a company that has fully and timely discharged all its disclosure obligations. But the allegations here are that a company has not discharged its disclosure obligations and has permitted prior statements (concerning strategic alliances) to become misleading by a material nondisclosure (of the active consideration of a dilutive rights offering). *In such circumstances, we consider the pleading sufficient to survive dismissal because, however efficiently markets may be thought to work when disclosures are proper, it is not beyond doubt that they may not fully correct for prior misleading information once a necessary disclosure has been made. Though, in many circumstances, a truthful correction might be expected promptly to alert the market to errors in prior statements, whether those erroneous prior statements were made willfully or innocently, it is possible, in some circumstances, that the embellishments of a deliberately false statement and the manner of its dissemination might leave its effects lingering in the market for some time, despite a correcting statement. In a case like the pending one, however, the issue is not whether the misleading aspect of the prior statement in fact lingered; it is only whether the plaintiffs can show that the defendants had a motive not to promptly*

---

**5.** Presumably, announcement of a rights offering will tend to reduce a stock price by the extent to which the offering, if fully subscribed, dilutes the position of the original shareholders. For example, if a company with 1,000 outstanding shares selling at $100 a share raises $100,000 of new capital by a rights offering that issues 2,000 shares at a price of $50 a share, the original shareholders will own one-third (1,000 shares of 3,000 outstanding) of a company that should be worth $200,000, and the share price after the rights offering should be $66.67 ($200,000/3,000). The question is whether an artificial enhancement of the pre-rights offering price to, say, $150 per share, thereby creating a post-rights offering company "worth" $250,000 can result in a post-rights offering stock price of somewhere between $83.33 ($250,000/3,000) and $66.67. If so, the company might decide to set the rights offering price somewhat above $50 in the expectation that it could raise the needed $100,000 by issuing somewhat less than 2,000 shares, thereby somewhat reducing the dilutive effect of the offering.

**6.** Two critics have expressed their doubts in these colorful words: "If the efficient markets hypothesis was a publicly traded security, its price would be enormously volatile.... [T]he stock in the [conventional] hypothesis ... crashed along with the rest of the market on October 19, 1987. Its recovery has been less dramatic than the rest of the market." Andrei Shleifer & Lawrence H. Summers, *The Noise Trader Approach to Finance*, J.Econ.Persp. 19 (Spring 1990).

correct the misleading aspect of the prior statement. Whether such a motive existed depends not on what any member of this panel believes, but on what the plaintiffs can prove.

Since the laws of economics have not yet achieved the status of the law of gravity, we cannot say, on a motion to dismiss, that the plaintiffs cannot prove that a motive existed. What cannot be determined from the pleadings is whether, in this instance, the defendants acted to maintain the stock price at an artificially enhanced value in the hope that it would not descend all the way to its "true" value upon announcement of the fact—consideration of the rights offering—that rendered the prior statements misleading. Whether some focused preliminary discovery will permit the matter to be resolved adversely to the plaintiffs on a motion for summary judgment remains to be determined.

**B. Circumstantial evidence of conscious or reckless behavior**

■ In contrast to the motive and opportunity approach, the complaint cannot be said to adequately plead scienter under the circumstantial evidence of conscious or reckless behavior approach, at least with respect to nondisclosure of the rights offering. There may be adequate allegations of scienter as to nondisclosure of difficulties in the search for strategic alliances, but we have held that the complaint alleges no actionable nondisclosure in this regard. As to the nondisclosure of the rights offering, the complaint lacks allegations that give rise to a strong inference that Time Warner began to consider the rights offering significantly before it was announced. A single mention of a newspaper report alleged to state that "Time Warner has been quietly working for months on its plans for the rights offering," Third Amended Complaint ¶ 81, is not adequate. Plaintiffs, however, have proposed to amend their complaint to supplement this necessary allegation, and this amendment may well be adequate.[7] We will leave it to the District Court to determine whether to allow plaintiffs the opportunity to amend their complaint so as to support an additional theory of scienter, and, if this opportunity is provided, to determine in the first instance whether such a theory is adequate.[8]

**III. State law claims**

Our reinstatement of the section 10(b) claim mandates reinstatement of the state law fraud claim as well. The basis for the dismissal of the state law fraud claim was the failure to plead a misrepresentation or omission of a material fact, a requirement under New York law. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Atlantic Welding Services Inc. v. Westchester Steel Fabricators Corp.*, 173 A.D.2d 1073, 1074, 570 N.Y.S.2d 410, 412 (3d Dep't 1991). We have ruled that the complaint adequately pleads material omissions.

■ However, plaintiffs' negligent misrepresentation claim was properly dismissed. With few exceptions, New York strictly limits negligent misrepresentation claims to situations involving "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Ossining Union Free School District v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419, 541 N.Y.S.2d 335, 335 (1989). Plaintiffs do not allege privity of contract. The exceptions, embracing cases in which defendants make negligent misrepresentations intending that identified persons rely on the misrepresentations, have been held not to apply to the investing public. *See In re Par Pharmaceu-*

---

7. Specifically, plaintiffs state that they would allege that as early as November 1990, the rights offering was under consideration. This allegation is grounded in a report, contained in the material discovered in the Delaware action and provided to plaintiffs, of a meeting at which Merrill Lynch presented Time Warner executives with a proposal for an equity offering designed to extinguish certain classes of preferred stock.

8. Since the claim we reinstate concerns only nondisclosure of the rights offering between May 1, 1991, and June 6, 1991, any class to be certified would include, at most, those who purchased shares in that period.

*tical, Inc. Securities Litigation,* 733 F.Supp. 668, 686 (S.D.N.Y.1990).

### Conclusion

We reverse the order of the District Court dismissing counts one and two of the complaint, and affirm the order dismissing count three of the complaint. The case is remanded for further proceedings consistent with this opinion.

WINTER, Circuit Judge, dissenting:

I respectfully dissent. In my view, Time Warner's purported scheme to float a variable-price rights offering at an artificially inflated price is at odds with many long-standing assumptions of the securities laws and thus does not suffice to establish scienter for purposes of a Rule 12(b)(6) motion. Moreover, it is expressly contradicted by the complaints.

### I

First, the area of agreement. I agree that the allegation that Time Warner's failure to disclose active consideration of the variable-price rights offering was material in that it rendered prior statements arguably misleading. Under *Kronfeld v. TWA,* 832 F.2d 726 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), a trier may find that the disclosure of one possible financial strategy (or strategies) is misleading when another strategy with substantially more negative implications for investors is also being seriously considered. In *Kronfeld,* a failure to disclose consideration of the complete severing of ties with a subsidiary was held to be material in light of the disclosure of less drastic strategies. *Id.* at 736. Because the drastic severance alternative had yet to be considered by the parent's board, *Kronfeld* establishes a rather inclusive test of materiality, and the complaint here alleges facts more compelling than those in *Kronfeld.* It therefore cannot be dismissed on materiality grounds.

Because I view the complaints in a somewhat different light than my colleagues, I will set out in some detail what I regard to be the pertinent allegations. Time Warner had tak-

en on considerable debt and had a balloon payment coming up. This was not news to the market for its shares. Over the course of time, various officers of Time Warner made statements regarding strategic alliance conversations and the benefits of such alliances. These benefits sometimes involved the penetration of new markets or the development of new products, frequently involved the infusion of cash that would be available to pay off the debt, and sometimes involved both. Analysts responded favorably, noting that they anticipated the consummation of strategic alliances, sales of Time Warner assets, or other "restructurings," any of which would enable the company to meet its debt payments.

Given the somewhat loose use of the term "dilution" in this litigation and my view of the scienter issue set forth *infra,* two matters must be emphasized. First, when a debt-ridden company raises cash by a strategic alliance, a sale of an asset, or a restructuring, the parties providing the cash will demand interests in the company that dilute the existing common shares in the sense that it will reduce their share of equity. Indeed, it is inconceivable that any strategic alliance could have been consummated by Time Warner without sharing, and diluting, equity interests. Second, investors who do not care about control also do not care about dilution. They care about share value, and that value may (in this case would) increase as a result of a diluting infusion of cash brought about by a strategic alliance or even by an issue of additional common stock.

The failure to consummate a strategic alliance and subsequent resort to the issuance of new shares, therefore, would, if the offering here was a traditional offering of common shares, be dilutive but not injurious. Indeed, some of the analysts quoted by the complaint for the purpose of establishing misrepresentations contemplated asset sales that would dilute the equity by shrinking it or restructurings that might include the issuance of more dilutive shares. These analysts nevertheless expected share value to increase. In my view, therefore, Time–Warner's failure to disclose active consideration of an equity of-

fering did not make its prior statements misleading.

However, the offering here was not your standard equity offering. The variable-price rights offering—although not consummated, it is the offering that allegedly rendered prior statements misleading—was restricted to existing shareholders. This was news in light of the prior statements because it indicated that outside capital was not available. It thus indicated that the only source of capital available for the debt payments were the locked-in shareholders of Time Warner who might lose all if the company defaulted on the debt. Moreover, the variable-price rights offering was dilutive but in a very different sense from that indicated by my colleagues. If all shareholders exercised their rights, each would purchase one new share for $105. If only 60% exercised the rights, those shareholders would purchase 1⅔ shares for $63. As the complaints allege, therefore, the offering was coercive because shareholders hoping to minimize their losses would feel compelled to come up with fresh money. Unlike an infusion of capital from outside that would dilute but also benefit shareholders, this new issue of equity would necessarily lessen the value of the common shares because existing shareholders had either to put up more money or to incur a disproportionate loss in value. In light of the prior statements, therefore, active consideration of the variable-price option should have been disclosed under *Kronfeld*, 832 F.2d at 737.

## II

My disagreement with my colleagues concerns the complaints' allegations with regard to scienter, or in this case the motive for the alleged failure to make timely disclosure. There is certainly no self-evident motive. The variable-price rights offering was a drastic step, to be sure, and very bad news, but the timing of the announcement seems rather irrelevant. The complaints allege that appellees failed to make early disclosure because of the fear that potential partners would be scared off by the bad news. That is implausible, however. News that Time Warner could raise fresh cash from its shareholders would be welcome news to potential partners concerned about the burden of debt. That news thus might cause negotiations close to agreement to succeed. It appears, however, that no alliance conversations were ever that close to an agreement.

The scenario relied upon by my colleagues to establish motive is that Time Warner management failed to disclose consideration of the variable-price rights offering to inflate the price at which that offering could be sold so that the dilutive effect would be minimized. The legal and logical flaws in this scenario seem rather plentiful. As a threshold matter, the complaints, as discussed *infra*, at times contradict it. This scenario also was not argued in the district court, its source being a single paragraph in appellants' 49–page brief in this court.

Most important, the scenario is wholly implausible in light of the nature of the variable-price rights offering. Time Warner management was not seeking to minimize the dilutive effect on existing shareholders. To the contrary, as the complaints vigorously allege and as discussed *supra*, the variable-price rights offering created a disproportionate dilutive effect on non-exercising shareholders as a means of coercing shareholders to exercise the rights. The notion that the existing shareholders would continue to rely upon long-gone statements regarding fresh capital in the face of the coercive rights offering is entirely far-fetched. The complaints allege in great detail that the rights offering "shocked the investment community," was viewed by analysts as an admission that Time Warner was unable to find fresh money from outside, and had "ang[ered]" shareholders. How the management of Time Warner might have expected any other reaction, much less continued faith in weeks-old statements that outside capital was available, defies common sense. The very existence of the variable-price rights offering was a tangible, high-profile, and unmistakable negation of the earlier statements. That indeed is the reason that a failure to make timely disclosure is a material omission. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Moreover, the management of Time Warner knew at all pertinent times that such an offering had to be preceded by the filing of a registration statement with the SEC followed by a statutory waiting period. Securities Act of 1933, § 5, 15 U.S.C. § 77(e) (1988); *id.* § 8(a), 15 U.S.C. § 77h(a) (1988). That registration statement would have to reveal the failure of the strategic alliance talks and the fact that holders of Time Warner's common shares who would not or could not come up with more money would find their interests diluted. Securities Act of 1933, § 7(a), 15 U.S.C. § 77g(a) (Supp.1991) & Sched. A. That information would become public when filed, and investors would have several days to assimilate it before the rights offering could be sold. When it was filed on June 6, the registration statement, in the words of one complaint, "shocked the investment community," while by its own terms the registration statement could not be effective before June 17.

This scenario posits a management that expects that the disclosure of the failure of the strategic alliance conversations and resort to a coercive rights offering would not be fully assimilated by shareholders during the waiting period. It also posits that a substantial number of shareholders would continue to give credence to statements that were weeks old and flatly contradicted by the registration statement.

My colleagues express skepticism about the usefulness of the efficient market hypothesis (while quoting a rather uncritical acceptance of it by the Supreme Court) in *Basic, Inc. v. Levinson,* 485 U.S. 224, 246–27, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988). However, the notion that markets impound available information relatively promptly in share prices, at least in widely traded companies, pervades securities law. Most pertinent is the statutory provision for a waiting period after the filing of a registration statement. One purpose of the waiting period is to allow ample time for the information contained in the statement to be absorbed by investors. Indeed, that is why acceleration of the validity of a registration statement depends in part on whether the information contained in it has been widely disseminated.

SEC Reg. C, Rule 461(b), 17 C.F.R. § 230.-461(b) (1993).

In *Texas Gulf Sulphur,* we indicated that an insider might trade on previously confidential information within a reasonable period of time after information was disseminated on the Dow Jones tape. 401 F.2d at 854. Although no doubt unintended, my colleagues' belief that the market cannot fully absorb what was headline information in the financial press over a period of many days would seem quite inconsistent with *Texas Gulf Sulphur.* Moreover, the SEC's adoption of Form S–3 was based on the view that filings with the SEC by widely traded companies are quickly absorbed in the price of shares. *See* Adoption of Integrated Disclosure System, Securities Act Release No. 6383, 47 Fed.Reg. 11,380 (1982).

Finally, although there are weak forms of the efficient market hypothesis, a fairly strong form has been adopted by the Supreme Court. *See Basic, Inc.,* 485 U.S. at 246, 108 S.Ct. at 991 ("Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information...."). Indeed, one of the striking ironies of my colleagues' ruling is that the complaints in the present matter stress the efficiency of the market for Time Warner shares and never allege even the possibility that the strategic alliance statements had, or could have had, a lingering effect after June 6. To the contrary, one complaint alleges that the market "reacted promptly to disclosure" that the quest for strategic partners had failed. While my colleagues suggest that the efficient market hypothesis is flawed, each of the complaints alleges it as an operative fact so far as Time Warner stock is concerned. Each complaint thus states that Time Warner stock "traded on an active and efficient market," or uses similar language. Of course, these allegations are intended to establish appellants' reliance upon the material omission. *See Basic, Inc.,* 485 U.S. at 243, 108 S.Ct. at 989. The result of the present ruling is that appellants are allowed to establish reliance in their pleadings by stressing the efficiency of the market in Time Warner's shares while estab-

lishing scienter by positing a market that cannot absorb a current registration statement's negation of weeks-old information. This inconsistency seems rather stark in light of the facts that the statements concerning strategic alliance conversations promised no success while the announcement of the variable-price rights offering unambiguously disclosed the failure of those conversations. Nevertheless, plaintiffs avoid dismissal on the claim that investors would continue to harbor unwarranted optimism as a result of the earlier statements notwithstanding the company's later straightforward admission of failure.

It is not my position that one must simply assume the efficiency of markets, although the strength of such an assumption is greatest in the case of widely traded companies, like Time Warner, whose affairs are closely followed in the financial press. However, allegations of delays in the absorption of information, the existence of "bubbles," or other inefficiencies should be made with some precision. In the present matter critical ambiguities—as well as the internal contradiction concerning the issue of reliance noted above—shroud my colleagues' views of the operation of capital markets. For example, the present ruling suggests, as noted, that the legally designated waiting period is too short for the market to absorb information in a registration statement. If so, how can we be confident that disclosure on May 1 would have led to any greater absorption?

The only description given of the supposed imperfection is a suggestion that markets may work efficiently "when disclosures are proper [but] it is not beyond doubt that they may not *fully* correct for prior misleading information once a necessary disclosure has been made." (emphasis in original) I doubt the validity of this proposition. It appears to posit that if A, Inc. truthfully projects high earnings and later states, again truthfully, that it now expects only to break even, the market can absorb the downgrading. It also seems to posit that if A, Inc. falsely projects high earnings but later states truthfully that it now expects only to break even, the market cannot fully absorb the downgrading. This does not seem plausible to me.

Nor can I find an explanation of why the inefficiency of the market is only on the up rather than on the down side. Why doesn't the dashing of hopes as to strategic alliances and the adoption of a coercive, variable-price rights offering lead to overcorrection instead of undercorrection? More pertinently, why would Time Warner management expect—actually, count on—undercorrection?

Neither Time Warner nor its shareholders, who must pay the costs of defending and settling this action, profited from any delay in announcing the variable-price rights offering. The argument regarding a motive for such delay posits a scenario that is inconsistent with assumptions underlying securities law, statements in the complaint, and any plausible understanding of the operation of capital markets. I would affirm the dismissal of the complaint.