964 F.2d 149
 Fed. Sec. L. Rep. P 96,804
Malcolm I. GLAZER, Farmington Mobile Home Park, Inc., Fabri
Development Corp., Valley-Ho Mobile Home Park, Inc.,
Lakeview Mobile Home Park, Inc., Avram Glazer, Bryan Glazer,
Darcie Glazer, Edward Glazer, Joel Glazer, Kevin Glazer,
Plaintiffs-Appellants,
v.
FORMICA CORPORATION, Vincent P. Langone, Defendants-Appellees.
 No. 1292, Docket 91-9298.
 United States Court of Appeals,
Second Circuit.
 Argued April 1, 1992.
Decided May 18, 1992.
 
 William G. Bauer, Rochester, N.Y. (Gordon E. Forth, Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, N.Y., on the brief), for plaintiffs-appellants.
 Laurence A. Silverman, New York City (Robert A. Alessi, Silda Palerm, Cahill Gordon & Reindel, New York City, on the brief), for defendants-appellees.
 Before KEARSE and MAHONEY, Circuit Judges, and RESTANI, Circuit Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Malcolm I. Glazer, et al., appeal from a final judgment of the United States District Court for the Western District of New York, Michael A. Telesca, Chief Judge, dismissing their claims against defendants Formica Corporation ("Formica" or the "company"), et al., under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5 (1991), in connection with a management-led leveraged buyout ("LBO") of Formica in May 1989. The district court granted summary judgment dismissing the amended complaint ("complaint") on the grounds that there was insufficient evidence that statements made by defendants were untrue or misleading or that any failure to disclose was material. On appeal, plaintiffs principally challenge the court's ruling that certain of Formica's press releases were not untrue or misleading and contend that there were genuine issues of fact as to the materiality of the company's nondisclosures. For the reasons below, we reject plaintiffs' contentions and affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 Formica is a corporation that produces high-pressure decorative laminates and other surfacing products. At all pertinent times, defendant Vincent P. Langone was its president and chief executive officer. The plaintiffs (collectively "Glazers") are self-employed private investor Malcolm I. Glazer ("Malcolm"), six of his children, and four companies wholly owned by him. The present lawsuit arises out of overtures made by Glazers in 1988 for the purchase of Formica. Many of the events are not in dispute.
 
 
 3
 A. Glazers' Unsuccessful Proposal To Acquire Formica
 
 
 4
 On August 4, 1988, Glazers filed a Schedule 13D with the Securities and Exchange Commission to report their acquisition of 9.9% of Formica stock. The Schedule 13D stated that Glazers "may seek to acquire a controlling interest in [Formica's] Shares or obtain representation on [Formica's] Board of Directors." It also stated that Malcolm's wholly-owned First Allied Investors Corporation ("First Allied") would be the investment vehicle for Glazers' future Formica dealings. With the filing of Glazers' Schedule 13D, Malcolm issued a press release. On the following day, the price of Formica stock rose 2.375 points to close at $15.375.
 
 
 5
 On August 19, Formica's board met and discussed, inter alia, Glazers' Schedule 13D. After receiving a presentation from the company's investment bankers, the directors concluded that Glazers were not a serious potential suitor because they lacked the financial wherewithal to consummate an acquisition of Formica.
 
 
 6
 On September 29, after unsuccessful telephone attempts to arrange a meeting, Malcolm sent Langone a letter setting out an offer by First Allied to acquire Formica for $20 per share in a friendly transaction that would include unspecified "customary" provisions. The offer was conditioned on, inter alia, First Allied's obtaining the necessary financing. The letter did not describe what financing, if any, had already been secured.
 
 
 7
 On September 30, Formica issued two press releases (the "September Releases"). The first stated that the company had rejected Glazers' proposal:
 
 Formica Rejects
 Leveraged Acquisition Proposal
 
 8
 .... Formica Corporation ... announced that First Allied Investors Corporation has informed Formica that it is prepared to make an offer to acquire Formica at $20 per share, not all of which would be cash. The proposal is subject to various conditions including due diligence and First Allied's ability to obtain financing for the transaction. First Allied stated that its proposal assumes a friendly transaction endorsed by the Board of Directors of Formica.
 
 
 9
 Mr. Vincent P. Langone, President and Chief Executive Officer of Formica, stated that it is the position of Formica that it is in the best interests of the Company and its stockholders for Formica to continue as an independent public company and that First Allied has been so advised.
 
 
 10
 In August, 1988 a group including Mr. Malcolm I. Glazer, the President of First Allied, filed a Schedule 13-D stating that the group beneficially owned approximately 9.9% of the outstanding common stock of Formica.
 
 
 11
 The second September 30 release stated that though Formica believed it best to remain independent, it would consider any legitimate acquisition proposal:
 
 
 12
 ....Formica Corp[.] will consider any legitimate proposal to acquire the company, a company official said.
 
 
 13
 "Any legitimate offer will have to be evaluated by our board of directors," said Charles A. Brooks, the company's chief financial officer. He said Formica believes the best thing for the company and its stockholders is to remain independent.
 
 
 14
 On September 30, Reuters described Formica's releases and financial industry reactions as follows:
 
 
 15
 Earlier today, Formica said it received and rejected a 20 dlrs per share offer to be acquired by [First Allied Investors Corp], saying it prefers to remain independent.
 
 
 16
 Later, traders said they expected another offer for Formica, even though the stock was trading below the offer price. "We're saying there's going to be a little bit higher offer," one trader said.
 
 
 17
 Traders said Formica's takeout value could be as high as 23 dlrs per share.
 
 
 18
 On October 1, "The Daily Telegraph," in an article entitled "Formica for sale," reported that Formica "put itself up for sale yesterday when, while rejecting a ... ($20 per share) bid from First Allied, an investment group, it said it would evaluate any legitimate offers." The article reported that arbitrageurs anticipated an eventual purchase price of about $23 per share.
 
 
 19
 On October 4, First Allied issued its own press release, quoting Malcolm as "not[ing] that Formica's refusal to participate in discussions regarding the [First Allied] proposal is totally contradictory to Formica's recent announcement that it will consider any legitimate proposal to acquire the company." On October 11, Malcolm called Langone to discuss the possibility of acquiring Formica, but he and his investment group soon abandoned their efforts and sold their stake in Formica.
 
 
 20
 In the wake of the September Releases, the closing price of Formica stock, which had been $13.25 on September 29, promptly rose some four points, to $17.125 on September 30 and $17.375 on the next trading day, October 3. Between September 30 and November 4, the closing prices of Formica stock fluctuated between $17.375 and $15.625 per share.
 
 
 21
 On November 4, Glazers arranged to sell all of their Formica holdings to Great American Realty, Inc. ("GAR") for $15.875 per share. In addition, GAR agreed to pay Glazers a premium if, before May 10, 1989, it either sold these holdings at a profit or purchased additional Formica stock at a higher price and gained a 15% or larger share of the company.
 
 B. Formica's LBO Discussions
 
 22
 In the meantime, in August and September 1988, Langone considered acquisitions of and mergers with other manufacturing companies, and he received inquiries from three investment banks concerning possible acquisition scenarios. With respect to two of the latter inquiries, from The First Boston Corporation and Bass Group, respectively, the discussions were quickly discontinued. The third such inquiry, from Dillon Read & Co., Inc. ("Dillon Read" or "Dillon"), led to continued discussions that ripened into the eventual 1989 LBO agreement.
 
 
 23
 The Dillon courtship began on September 30, when, at the suggestion of one of Formica's outside directors, Dillon telephoned Langone to state that it had taken an initial look at Formica and to ask whether Langone would be interested in discussing the concept of an LBO. A meeting was arranged, and on October 4, Langone and Dillon met briefly to discuss the feasibility of an LBO. On or about October 18, they again met briefly, and Langone indicated his interest in further exploration. On October 22, members of Formica's management and Dillon held a substantive meeting to discuss the LBO possibility. Dillon indicated that, though it had the financial ability to effect a buyout, it would have to do substantial due diligence before even drafting a proposal. Thereafter, Formica began to furnish Dillon with financial information in connection with the due diligence review. In January 1989, Formica consulted its attorneys and investment bankers with respect to the Dillon negotiations. On February 6, 1989, the Formica board of directors conditionally accepted a management-led proposal for an LBO at $18 per share.
 
 
 24
 Eventually, an LBO tender offer closed on May 3, 1989, at a price of $19 per share. GAR did not tender its shares and hence did not pay Glazers any premium.
 
 C. The Present Suit and the Decision Below
 
 25
 Glazers commenced the present action in May 1989 principally under Rule 10b-5, contending that defendants had intentionally withheld information about Formica's LBO plans in order to depress the price of Formica's stock and to deter potential acquirers. They asserted that as of September 30, Formica considered itself an acquisition candidate, and that the September Releases misled Glazers and the public into believing this was not so. Glazers alleged that they had been injured by selling their shares at a lower price than they would have obtained had the market not been manipulated.
 
 
 26
 In October 1991, following a period of discovery, defendants moved for summary judgment contending, inter alia, that as a matter of law (a) none of their statements had been false or misleading, (b) no omissions had been material, and (c) Glazers could not rationally have relied on Formica's statements for the proposition that the company would remain forever independent. In support of the proposition that Formica's negotiations with Dillon were not material information that was required to be disclosed prior to Glazers' sale of their stock on November 4, 1988, defendants submitted a "Statement of Material Facts As To Which Defendants Contend There Is No Genuine Issue To Be Tried," supported by affidavits and deposition excerpts. It stated, in pertinent part, that (1) at the October 22, 1988 meeting, Dillon indicated that it could not decide whether an LBO transaction for Formica would be viable without doing substantial due diligence; (2) thereafter Formica gave Dillon financial information in connection with the due diligence investigation, and as of November 4, Dillon was still in the initial stages of its due diligence and had made no commitment to do any transaction with respect to Formica; (3) as of November 4, Formica had received no offer from Dillon, and Formica's board of directors had received no resolution concerning any LBO; (4) prior to February 2, 1989, there was no agreement as to price or financial structure for an LBO by Dillon; (5) a management-led Dillon LBO proposal, at $18 per share, was first made to a special committee of the company's board on February 3; (6) on February 6, after three days of negotiations, the board conditionally accepted the proposal, imposing the precondition that an auction be conducted by Formica's own investment banker in an effort to secure a higher price; (7) such an auction was conducted, with approximately 125 third parties, including Glazers, being contacted, and no such party offering a higher price; and (8) in April 1989, the management group, joined by a third party, raised its LBO offer to $19 per share, the price at which the May 1989 tender offer was eventually conducted. Glazers, in their responding "Statement of Material Facts As To Which Plaintiffs Contend There Are Genuine Issues [To] Be Tried," suggested that they had been disadvantaged by Formica's failure to disclose prior to November 4, 1988, that agreement "in principle" had been reached with Dillon. But they adduced no evidence as to just when they contended such agreement had been reached, and they did not deny any of defendants' specific assertions listed above.
 
 
 27
 In a Decision and Order dated November 12, 1991 ("Opinion"), the district court granted defendants' motion for summary judgment on the grounds that between August 4 and November 4, defendants did not misrepresent or fail to disclose any material fact concerning Formica. The court found it undisputed that Glazers had knowledge of Formica's September Releases and that "the market interpreted those statements to mean that Formica had rejected the Glazer proposal and was open to any other (serious) acquisition proposals...." Opinion at 8. It found that "[t]he undisputed facts further establish[ed] that the discussions between Formica management and Dillon Read concerning the leveraged buyout ultimately effected in 1989, were at that time in a stage so preliminary and tentative as to render them non-material for purposes of Rule 10b-5." Opinion at 8. The court found that Glazers had proffered
 
 
 28
 no evidence sufficient to submit to a jury either (i) that Formica's public announcements of September 30, 1988 were untrue or misleading or (ii) that subsequent events in September-November 1988, related to the acquisition of Formica, were material to Formica investors so that the failure to make disclosure of them rendered the earlier public statements misleading.
 
 
 29
 Id. at 7. It concluded that a rational juror could not find that a reasonable investor in Glazers' position would have considered information about the Dillon negotiations significant, either in isolation or in the context of all other available information.
 
 
 30
 Judgment was entered dismissing the complaint, and this appeal followed.
 
 II. DISCUSSION
 
 31
 On appeal, Glazers pursue their arguments that the September Releases were untrue and misleading because (a) they failed to disclose material information about Formica's LBO efforts as of September 30, 1988, and (b) defendants failed to make disclosures about the Dillon developments thereafter, all of which led Glazers to believe that "Formica was not for sale" (Glazers' brief on appeal at 13). Glazers argue that summary judgment was inappropriate because there were genuine issues of fact as to the materiality of Formica's LBO activities, both as of the date of the September Releases and thereafter.
 
 
 32
 When a party has moved for summary judgment on the basis of asserted facts supported as required by Fed.R.Civ.P. 56(e) and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party. See, e.g., Dusanenko v. Maloney, 726 F.2d 82 (2d Cir.1984) (per curiam). In order to defeat a properly supported motion for summary judgment, the nonmoving party must adduce sufficient evidence to permit a reasonable jury to return a verdict in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). For the reasons below, we conclude that summary judgment was appropriate here.
 
 A. The September Releases
 
 33
 Rule 10b-5 provides, in pertinent part, that it shall be unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ..., in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. In Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Basic"), the Supreme Court discussed the meaning of the term "material fact" in the context of information possessed by a company that was a possible merger target. Since an LBO will normally have the same effect as a merger, i.e., the death of the target company's independent public form, see id. at 238, 108 S.Ct. at 986-87, the Basic standards are applicable to LBOs as well.
 
 
 34
 In Basic, the Court stated that, in order to establish a prima facie case that statements were misleading in violation of Rule 10b-5, a plaintiff must show "that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." Basic, 485 U.S. at 238, 108 S.Ct. at 987 (emphasis in original). With respect to the materiality of omissions, in order to establish a prima facie case under Rule 10b-5 the plaintiff must show that there was a " 'substantial likelihood' " that a " 'reasonable investor' would have considered the omitted information significant at the time." Id. at 231-32, 108 S.Ct. at 983-84 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Further, for an omission to violate Rule 10b-5, " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " Basic, 485 U.S. at 231-32, 108 S.Ct. at 983 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. at 449, 96 S.Ct. at 2132).
 
 
 35
 The mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material. "Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement." Taylor v. First Union Corp., 857 F.2d 240, 244 (4th Cir.1988), cert. denied, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989); see also Jackvony v. Riht Financial Corp., 873 F.2d 411, 415 (1st Cir.1989) (finding immaterial "the type of concern about possible acquisition that many large companies frequently express"). As stated in Basic, the materiality of a possible future event " 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " 485 U.S. at 238, 108 S.Ct. at 987 (quoting SEC v. Texas Gulf Sulfur Co., 401 F.2d 833, 849 (2d Cir.1968) (en banc ), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). Basic instructed courts to assess the probability of an event by looking at the "indicia of interest in the transaction at the highest corporate levels" and by considering, inter alia, "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries ... as indicia of interest." 485 U.S. at 239, 108 S.Ct. at 987. Whether merger discussions in any particular case are material or immaterial will normally depend on the facts of the case. Id.
 
 
 36
 The record in the present case did not disclose any genuine issue to be tried as to whether the September Releases at the time they were issued misstated or omitted any information that was material. Glazers' contentions (a) that defendants sought by those releases to depress the market price of Formica stock by misrepresenting that the company was not available, and (b) that as of September 30 there was material activity by defendants looking toward an LBO, were not supported by evidence sufficient to take the matter to a jury. Glazers presented no evidence that could lead a rational juror to infer that a reasonable investor would have construed the September Releases as representations that the company was not available for acquisition. The second release stated explicitly that Formica would "consider any legitimate proposal to acquire the company." One newspaper thus headlined the story "Formica for sale." Arbitrageurs were reported as speculating on the price the company might bring in an acquisition. And Malcolm himself complained that the company's refusal to entertain his offer was contrary to its "announcement that it will consider any legitimate proposal to acquire the company." In light of the announcement that the company would consider such proposals, no reasonable investor could have found that information as to the inconsequential and short-lived inquiries of The First Boston Corporation and Bass Group, or as to the first inquiring telephone call from Dillon on September 30, significantly altered the mix of information that was then available.
 
 
 37
 We conclude that the district court properly dismissed Glazers' Rule 10b-5 claim based on the September Releases themselves on the ground that, as a matter of law, they made no false statement or omission that was material.
 
 
 38
 B. Omissions as to the Post-September Dillon Negotiations
 
 
 39
 Though we also conclude that summary judgment was appropriate with respect to Glazers' claim that defendants' post-September silence as to the Dillon Read negotiations violated Rule 10b-5, we do so on the ground that prior to Glazers' sale of their Formica holdings there was no duty to disclose the course of those negotiations, not on the ground that the negotiations were immaterial as a matter of law.
 
 
 40
 The district court in the present case appeared to conclude that defendants' post-September nondisclosure of the Dillon negotiations was not material as a matter of law because prior to November 4, 1988, those negotiations had not ripened into agreement-in-principle. Thus, noting that as of October 22, 1988, Dillon had agreed only to undertake the due diligence necessary to determine the viability of an LBO of the type that had been discussed, the court stated that "the record is completely devoid of any evidence that defendants had reached 'an agreement in principle' with Dillon Read in October 1988 concerning the terms of a leveraged buyout which would meet with defendants' approval." Opinion at 9.
 
 
 41
 Prior to Basic, several courts had adopted the bright-line test that unless merger talks had ripened into agreement-in-principle as to price and structure, those discussions were as a matter of law not material within the meaning of Rule 10b-5. In Basic, the Supreme Court squarely rejected this approach, stating that it could
 
 
 42
 find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.
 
 
 43
 485 U.S. at 236, 108 S.Ct. at 986; see generally id. at 232-36, 108 S.Ct. at 983-86. Rather, the Court endorsed the materiality analysis set out in SEC v. Geon Industries, Inc., 531 F.2d 39 (2d Cir.1976) (Friendly, J.):
 
 
 44
 "Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions--and this even though the mortality rate of mergers in such formative stages is doubtless high."....
 
 
 45
 We agree with that analysis.
 
 
 46
 Whether merger discussions in any particular case are material therefore depends on the facts.
 
 
 47
 Basic, 485 U.S. at 238-39, 108 S.Ct. at 986-87 (footnote omitted) (quoting SEC v. Geon Industries, Inc., 531 F.2d at 47-48). Thus, while we express no view in the present case as to whether the Dillon negotiations prior to November 4 were or were not material as a matter of fact, we conclude that a ruling that the negotiations were immaterial as a matter of law because they had not resulted in agreement-in-principle was inappropriate.
 
 
 48
 Nonetheless, summary judgment was proper because even if the negotiations with Dillon had become material, there was no evidence of any facts that gave defendants a duty to disclose that information prior to Glazers' sale of their Formica stock. As the Supreme Court has made clear in insider trading cases, the concepts of materiality and duty to disclose are different. See, e.g., Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) ("a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information"); Dirks v. SEC, 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983) (same); see also Basic 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17 ("[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5"). Thus, as the First Circuit stated in Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir.1990) (en banc):
 
 
 49
 The materiality of the information claimed not to have been disclosed ... is not enough to make out a sustainable claim of securities fraud. Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.
 
 
 50
 Backman v. Polaroid Corp., 910 F.2d at 12 (quoting Roeder v. Alpha Industries, Inc., 814 F.2d 22, 26 (1st Cir.1987)). In Roeder, the court had elaborated: "One situation in which there is a duty to disclose is when a corporate insider trades on confidential information.... [Or, w]hen a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate...." Id. The First Circuit thus rejected the proposition that " 'a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures. The prevailing view ... is that there is no such affirmative duty of disclosure.' " Backman v. Polaroid Corp., 910 F.2d at 12 (quoting Roeder v. Alpha Industries, Inc., 814 F.2d at 27).
 
 
 51
 Other circuits have recognized the conceptual difference between materiality and duty to disclose in the context of merger or acquisition negotiations. Thus, the Sixth Circuit, upholding the summary dismissal of a Rule 10b-5 action challenging nondisclosures with respect to a tender offer, stated that "the established view is that a 'duty to speak' must exist before the disclosure of material facts is required under Rule 10b-5." Starkman v. Marathon Oil Co., 772 F.2d 231, 238 (6th Cir.1985), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Similarly, the Fourth Circuit, reversing a judgment against companies that had not disclosed that "they [had] agreed to establish a relationship, described as similar to 'pinning' as that term was used socially thirty years ago," Taylor v. First Union Corp., 857 F.2d at 243, observed that "Rule 10b-5 imposes ... a duty to disclose only when silence would make other statements misleading or false," id. at 243-44. We agree that the mere fact that exploration of merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that the companies have a duty to disclose.
 
 
 52
 In the present case, Glazers adduced no evidence of any facts giving rise to a duty on the part of defendants prior to November 4, 1988, to disclose the existence and status of the Dillon negotiations. There was no suggestion that defendants were trading in Formica stock. Nor was there any suggestion that they made any public statements other than the September Releases. Those releases were not false or misleading: they stated that the company would entertain any acquisition proposal regarded by the company as serious. Glazers proffered no evidence that that was false. And the conduct of negotiations with Dillon was indisputably consistent, not inconsistent, with the prior representation that such overtures would be considered.
 
 
 53
 In sum, we conclude that judgment summarily dismissing Glazers' claim under Rule 10b-5 for defendants' failure to disclose the post-September Dillon Read negotiations was proper because Glazers failed to show any duty to disclose.
 
 CONCLUSION
 
 54
 We have considered all of Glazers' arguments on this appeal and have found in them no basis for reversal. The order of the district court dismissing the complaint is affirmed.
 
 
 
 *
 Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation