Hadassa Y. BUXBAUM,
et al., Plaintiffs,

v.

DEUTSCHE BANK AG and Rolf–
Ernst Breuer, Defendants.

No. 98 CIV. 8460(JGK).

United States District Court,
S.D. New York.

Feb. 7, 2002.

Lester L. Levy, Michael A. Schwartz, Michele F. Raphael, Wolf Popper LLP, New York City, Stanley D. Berstein, Robert J. Berg, Bernstein, Liebhard & Lifshitz, LLP, New York City, for plaintiffs.

Jeffrey Barist, Michael L. Hirschfeld, Milbank, Tweed, Hadley & McCloy, LLP, New York City, for defendants.

## OPINION AND ORDER

KOELTL, District Judge.

This is a class action brought on behalf of all persons who sold Bankers Trust Corporation ("Bankers Trust") common stock or call options, or purchased Bankers Trust put options, on the open market between October 26, 1998 and November 20, 1998.[1] Defendant Deutsche Bank AG ("Deutsche Bank") is a German corporation which acquired Bankers Trust in a transaction approved by the companies' respective boards on November 29, 1998. Defendant Rolf–Ernst Breuer is, and was at all relevant times, the spokesman of Deutsche Bank's management board. (Declaration of Michael L. Herschfeld, dated May 4, 2001 ("Hirschfeld Decl."), Ex. 2 at 6.) Breuer's role at Deutsche Bank is similar to that of the chief executive officer in an American corporation. (*Id.*)

The plaintiffs allege violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Am. Compl.¶¶ 55, 59.) The defendants have moved for summary judgment and the plaintiffs have moved for partial summary judgment on the issue of liability.

### I

There is no dispute as to the following facts, except as noted. On Thursday, October 22, 1998, Breuer was interviewed by a reporter from Der Spiegel, a popular German newsweekly. (Hirschfeld Decl., Ex. 2 at 140–42.) The interview was conducted in German, and was published in the October 26, 1998 edition of Der Spiegel. (Pl.App., Ex. 50.) In the week leading up to the interview there were media reports that Bankers Trust and Deutsche Bank were engaged in talks. In particular, the *Financial Times* reported on Tuesday, October 20, 1998 that "Deutsche Bank...has opened preliminary takeover talks with Bankers Trust...." (Pl.App., Ex. 49.) In the course of the Der Spiegel interview, the reporter asked, and Breuer answered, several questions about the possibility of a transaction involving Deutsche Bank and Bankers Trust. (Pl.App., Ex. 50 at 120, 122.)

While the parties do not dispute that the interview, as published, accurately reflects what was said in German, the translation of the exchange into English is a matter of dispute. The plaintiffs' translation is:

Spiegel: Are you interested in the U.S. investment bank Bankers Trust, as the media reported this week?
Breuer: There is nothing to report to shareholders.
Spiegel: But you did talk to the Americans, didn't you[?]
Breuer: In this business everybody speaks to everyone. But there was no talk of any takeover.
Spiegel: But Bankers Trust lets you in on their books?

---

1. The following are excluded from the class: the defendants in this action; members of the immediate family of the individual defendant; any parent, subsidiary, affiliate, officer, or director of defendant Deutsche Bank AG; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors, and assigns of any excluded person.

Breuer: No. After all, that would already be like pillow talk.

(Pl.App., Ex. 23 at 4 (emphasis added).) The defendants' translation of the same excerpt reads:

Spiegel: Are you interested in the American investment bank Bankers Trust, as the media reported this week?
Breuer: There is nothing I could tell the shareholders.
Spiegel: But you did have talks with the Americans, didn't you?
Breuer: In this industry, everybody talks to everyone. But there were no takeover talks.
Spiegel: But Bankers Trust is letting you have a look at their books?
Breuer: No. After all, that would already be pillow talk.

(Hirschfeld Decl., Ex. 21 ¶ 11 (emphasis added).)

A number of financial newspapers around the world published accounts of the Der Spiegel interview on October 25 and 26. (Pl. App., Exs. 106 & 107.) On October 26, the first day of trading following publication of the Der Spiegel interview and reports of the interview from other news sources, the price of Bankers Trust common stock fell, ending the day approximately 6% below the previous closing price. (Pl.App., Ex. 96 at 5.) In the previous week, when reports that Bankers Trust and Deutsche Bank were in talks had circulated (Pl.App., Exs. 49 & 105), the stock's price had risen by approximately 30% (Pl.App., Ex. 96 at 5). On November 23, the day that Bankers Trust and Deutsche Bank publicly announced that they were in the advanced stages of merger talks (Pl.App., Ex. 108), Bankers Trust stock ended the day approximately 9% higher than its previous closing price (Pl. App., Ex. 96 at 3–4).

Several possibly relevant contacts between Deutsche Bank and Bankers Trust officials had taken place by the time of the Der Spiegel interview. The first contacts took place in July, 1998. Late in the evening of July 15, Edson Mitchell of Deutsche Bank spoke with Bankers Trust vice-chairman Yves de Balmann on the telephone in order to advise de Balmann of certain thinking at Deutsche Bank about Bankers Trust, in anticipation of a dinner involving executives of the two banks. (Pl.

App., Ex. 6 at 46–47.) Mitchell said that Breuer knew he was calling and Mitchell conveyed, according to de Balmann's notes of the call, that Deutsche Bank was looking strategically, that Bankers Trust was a name that made sense, and that a combined entity would have a powerful United States and European franchise. (Pl.App., Ex. 6 at 58–59; Pl.App., Ex. 82.) That same evening, de Balmann informed Frank Newman, Bankers Trust's Chief Executive Officer, about his telephone call with Mitchell. (Pl.App., Ex. 6 at 67–68.)

The following evening, July 16, Ronaldo Schmitz, a member of the Deutsche Bank management board, had dinner in New York City with Newman and Phillip Griffiths, a Bankers Trust board member who was also an acquaintance of Schmitz's. (Hirschfeld Decl., Ex. 13 at 70–71 & Ex. 15 at 81.) While the parties dispute the exact substance of the dinner conversation, there was some talk by Schmitz of Deutsche Bank's interest in some form of combining forces with Bankers Trust, and Newman conveyed that he was not interested because, "at this time," Bankers Trust had its own strategies that it was pursuing. (Declaration of Michael L. Hirschfeld, dated June 1, 2001 ("Hirschfeld Opp. Decl."), Ex. V at 27–28.)

Between July 16 and September 30, 1998, Bankers Trust's stock price fell by approximately 51%. (Pl.App., Ex. 96 at 6, 10.) Additional contacts between Deutsche Bank and Bankers Trust took place in October, 1998. On October 5,

Breuer met privately with Newman in Washington, DC, for between forty minutes and an hour. (Hirschfeld Decl., Ex. 13 at 165–66.) The details of the discussion between the executives are in dispute, but at the least, Breuer broached the topic of Deutsche Bank engaging in some sort of business combination with Bankers Trust. (Pl.App., Ex. 4 at 256–57; Hirschfeld Decl., Ex. B at 166–67.) At some point after the October 5 meeting, but before the Der Spiegel interview, Newman called Breuer to arrange another meeting at which the executives could speak at greater length. (Hirschfeld Decl., Ex. 13 at 190.) Breuer invited Newman to his home in Frankfurt, Germany, where the two met on October 25. (Pl.App., Ex. 4 at 36.) The parties also dispute what occurred at the October 25 meeting, but Newman has testified that Breuer asked if Bankers Trust was prepared to proceed to share nonpublic information, and that Breuer discussed the synergies that would result from a combined entity. (Pl.App., Ex. 15 at 313–15, 330–31.)

The July and October, 1998 contacts between Deutsche Bank and Bankers Trust executives did not take place in a vacuum. From July 14 through October 22, Deutsche Bank prepared numerous documents analyzing Bankers Trust and considering the prospect of a combination between the banks. (Pl.App., Exs.29, 30, 51, 52, 63, 81.) Breuer, Schmitz, and Deutsche Bank corporate strategy head Tillman Lauk also met in Wiesbaden, Germany with Ken Wilson, a managing director of Goldman Sachs ("Goldman") on September 11, 1998, and discussed possible acquisitions for Deutsche Bank. (Pl.App., Ex. 11 at 11, 79–80.) At that point, Deutsche Bank engaged Goldman as an advisor, based at least in part on the firm's familiarity with Bankers Trust and the relationship that Ken Wilson had with Newman. (Pl.App., Ex. 4 at 63.) Breuer made it clear, however, that he was personally in charge of the process. (Pl.App., Ex. 17 at 174.)

Goldman thereafter researched possible United States acquisition targets for Deutsche Bank. (Pl.App., Exs.37, 54, 67, 86, 93.) Goldman also produced financial analyses of Bankers Trust for Deutsche Bank, along with presentations regarding a possible combination between Deutsche Bank and Bankers Trust and "scripts" containing talking points that Breuer might use in discussions with Newman. (Pl.App., Exs.36, 55, 71, 77, 87.)

In addition to supervising Goldman's analytical work, Wilson engaged in discussions which contemplated the possibility of a transaction between Deutsche Bank and Bankers Trust. On September 18, Wilson contacted Victor Lewkow, a partner at Cleary, Gottlieb, Steen & Hamilton ("Cleary"), in connection with Cleary's work as legal advisor for Deutsche Bank in a possible business combination with any of a number of United States financial institutions. (Pl.App., Ex. 27 at X22292; Ex. 22 at 39–41.) On September 24, Wilson met again with Breuer, Lauk, and other senior Deutsche Bank officials for one to two hours, and it was agreed that Bankers Trust would be the first institution that Deutsche Bank approached. (Pl. App., Ex. 11 at 111.) At or right after that meeting, Deutsche Bank decided that Breuer should set up a meeting with Newman and, as noted above, the two met on October 5 in Washington, DC. (Pl.App., Ex. 22 at 80.) Wilson also met with Newman and Jeffrey Goldstein, one of Newman's principal aides, at least once during the period October 6 to October 23. (Pl. App., Ex. 22 at 52–53.) Wilson testified that Newman said that he thought he could make a major contribution to the combined entity. (Id.) Wilson spoke on the phone with Newman and Goldstein several times in September and October

(Pl.App., Ex. 22 at 63–64, 85–86), and also spoke frequently with Lauk and his deputy (Pl.App., Ex. 11 at 165, 167–68).

By the time of the Der Spiegel interview, Bankers Trust had, for its part, prepared internal documents which considered a merger with Deutsche Bank. (Pl. App., Exs. 31 & 101.) Bankers Trust had also engaged Morgan Stanley & Co. ("Morgan Stanley") as a financial advisor (Pl.App., Ex. 61 at MS 148–152) and Wachtell, Lipton, Rosen & Katz ("Wachtell") as a legal advisor (Pl.App., Ex. 15 at 220). On October 21, 1998, Goldman sent Wachtell a "Potential Timetable" for a transaction between Deutsche Bank and Bankers Trust. (Pl.App., Ex. 85.)

On October 23, 1998, the day after Breuer spoke with the Der Spiegel reporter, Bankers Trust provided Wilson with information about its third quarter results and third quarter capital and risk weighted assets. (Pl.App., Ex. 48.) Before the October 25 meeting between Breuer and Newman, Bankers Trust also met with Morgan Stanley, which calculated pro forma financials for a combined entity. (Pl. App., Ex. 45 & Ex. 15 at 269, 281–82.) The October 25 meeting was followed by a November 2 meeting in New York, at which Breuer and Newman agreed to negotiate a confidentiality agreement to allow the exchange of non-public information and proceed with the due diligence process. (Hirschfeld Aff., Ex. 2 at 203–04.) Morgan Stanley put Bankers Trust on its "watch list" at that time, indicating that it "had a high degree of confidence that [Morgan Stanley was] going to be advising [Bankers Trust] in a transaction." (Hirschfeld Decl., Ex. 11 at 142.) Deutsche Bank and Bankers Trust executed a confidentiality agreement on November 6. (Hirschfeld Decl., Ex. 30.) The Boards of Bankers Trust Corp. and Bankers Trust Co. discussed the Deutsche Bank transaction on November 22 (Pl.App., Ex.

100), and on November 23, Bankers Trust and Deutsche Bank announced that merger talks were in "advanced stages" (Pl. App., Ex. 108). Bankers Trust and Deutsche Bank approved the transaction on November 29. (Pl.App., Ex. 110.)

## II

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve

all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 177–78 (2d Cir.2001). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

### III

The defendants have moved for summary judgment on two grounds: that Breuer's statement was true and that the plaintiffs cannot establish scienter.

In order to prevail on a claim brought pursuant to § 10(b) and Rule 10b–5, a plaintiff must prove that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000) (alteration in original) (punctuation omitted) (citing *Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996)); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996)).

### A

■ The defendants claim that Breuer's statement was true when he made it, so it could not have constituted a false statement or material omission on his part which would give rise to liability under § 10(b) and Rule 10b–5.

In their brief, the defendants rely heavily on their translation of the Der Spiegel interview. In German, Breuer said "In dieser Branche spricht jeder mit jedem. Aber es gab keine Übernahmegespräche" in response to the reporter's questions about talks with Bankers Trust. The defendants translate this remark as "In this industry everybody talks to everyone. But there were no takeover talks," (Hirschfeld Decl., Ex. 21 ¶ 11) and claim that in German the term "Übernahmegespräche" is understood to refer to formal and structured talks between potential acquiror and target, with the acquiror having the benefit of confidential information provided by the target. Because the contacts between Deutsche Bank and Bankers Trust were not "formal and structured talks" at the time of the interview, argue the defendants, Breuer's statement was literally true.

In support of their position, the defendants have submitted the affidavit of Hans K. Herdt, a German citizen who was the editor-in-chief of a German financial newspaper from 1986 to 2000. (Hirschfeld Decl., Ex. 20.) Herdt states that " 'Übernahmegespräche' does not...have a defined juridical or regulatory meaning," but goes on to explain that "[i]n my experience as a financial editor...the term 'Übernahmegespräche' refers to a relatively advanced stage of discussions between two business entities contemplating the purchase of one by the other." (*Id.* ¶ 9.) The defendants' translator, Gregory John Rayner, further states that the question which elicited the phrase at issue—"Sie haben aber mit den Amerikanern Gespräche gehabt?"—should be translated, "But you did have talks with the Americans, didn't

you?" Rayner contends that "the word 'Gespräche' or 'talks' is the word most commonly used to describe high-level negotiations, such as 'NAFTA Talks' or the 'SALT Talks,' " and that in the context of the Der Spiegel interview the reporter's question "strongly denotes something more formal and structured than mere 'talk' or 'talking.' " (Hirschfeld Decl., Ex. 21 ¶ 9, 11, 15.)

In Herdt's view, when the reporter followed up on Breuer's denial of Übernahmegespräche by asking whether Deutsche Bank had access to Bankers Trust's books, the reporter was trying to find out how close the two banks had come to the "advanced stage of discussions" which "Übernahmegespräche" represents, since an "exchange of confidential financial information...would necessarily precede 'Übernahmegespräche.' " (Hirschfeld Decl., Ex. 20 ¶ 15.) According to Herdt, Breuer's response that Deutsche Bank did not have access to Bankers Trust's books and that such access would "already" be "pillow talk" meant that the banks "had not reached even the exchange of confidential information which might constitute the prelude for 'Übernahmegespräche.' " (*Id.* ¶ 13.)

The plaintiffs offer the report of Angela Jacobson, which takes a different position on the meaning of the word "Übernahmegespräche." Jacobson is a German citizen and a native German speaker who specializes in translating documents for corporate clients. (Decl. of Angela Jacobson dated May 23, 2001, ¶¶ 1–2.) Jacobson states that "Übernahmegespräche" is a term which may have different meanings to different German speakers, and that it "encompasses a spectrum of talks about a takeover, ranging from preliminary, exploratory talks up through and including the formal structured talks understood by Mr. Herdt." (*Id.* ¶ 8.) Under the plaintiffs' interpretation of "Übernahmegespräche,"

Breuer's "pillow talk" comment simply reinforces his denial that "talk of any takeover" had occurred. Because Breuer had stated that there was no such talk, the relationship between the banks could not have reached the advanced phase where they would be exchanging confidential information.

The defendants' argument as to the correct translation of "Übernahmegespräche" at most raises an issue of material fact, and is not a basis for summary judgment for the defendants. The plaintiffs' interpretation of the phrase "Übernahmegespräche" is at least as plausible as the defendants' and is supported by sworn evidence. Indeed, even some of Breuer's own testimony is consistent with the plaintiffs' broad interpretation of the term at issue. When asked about the "pillow talk" comment at his deposition, Breuer said that the reporter's question about Deutsche Bank's access to Bankers Trust's books went "far beyond the topic I had denied already...." (Declaration of Michael A. Schwartz, dated May 31, 2001 ("Schwartz Decl."), Ex. B at 157 (emphasis added).) Furthermore, the defendants have previously translated "Übernahmegespräche" as "takeover discussions" and "talks about a takeover." (Schwartz Decl., Ex. I at 1/122; Pl.App. Ex. 78 at X 15912.) The Court cannot find, at this point, that the truth of Breuer's statement must be evaluated by discerning whether the banks were engaged in "formal and structured talks."

The defendants claim that they are, nonetheless, entitled to judgment; indeed, at oral argument defendants' counsel did not assert that the Court should adopt the defendants' translation of "Übernahmegespräche." Instead, they argue that even if "Übernahmegespräche," as used by Breuer, refers to "talk of any takeover," Breuer was still telling the truth because

there had been no such talk at the time of the Der Spiegel interview. It is clear that the defendants cannot prevail on this basis because, viewing the evidence in the light most favorable to the plaintiffs as the non-moving parties on this motion for summary judgment, there are substantial issues of fact concerning whether talk of any takeover had occurred.

For example, Schmitz testified that at the July 16, 1998 meeting, he told Newman that the two banks had areas where they complemented each other and that they should explore the possibility of working together. (Pl.App., Ex. 17 at 117.) De Ballman's contemporaneous notes from his telephone conversation with Mitchell prior to the July 16 meeting refer to a "combined entity" and that the "fact that [Bankers Trust] is a bank makes combination easier." (Pl.App., Ex. 82.) And Breuer testified that at the October 5, 1998 meeting, he had conveyed to Newman that Deutsche Bank was interested in exploring Bankers Trust's position on a range of efforts, including a complete financial merger.[2] (Pl.App., Ex. 4 at 82.)

Furthermore, Wilson, the Goldman Sachs advisor who had been hired by Deutsche Bank, testified that he discussed the possibility of Deutsche Bank acquiring Bankers Trust with Newman at least once and had frequent discussions with Goldstein. (Pl.App., Ex. 22 at 81, 85–86.) Wilson also testified that the talks between the parties had "traction" by the time the Der Spiegel article came out and that his talks with Bankers Trust were detailed enough to include discussion of employee retention and what Newman's role would be in a combined organization. (Pl.App., Ex. 22 at 53, 86, 97.) Indeed, Wilson testified that he was "surprised," "upset,"

and "concerned" about the article, which prompted him to ask Lauk "what the heck was going on." (Pl.App., Ex. 22 at 97, 99–101.) These statements could suggest that Breuer's statements did not conform to the facts as Wilson knew them.

At the least, there is an issue of fact as to whether "talk of any takeover" had taken place by the time of the Der Spiegel interview. Therefore, construing the evidence in the light most favorable to the plaintiffs as the non-moving parties on the motion, it cannot be found as a matter of genuinely undisputed fact that Breuer's statement was accurate.

### B

■ The defendants next argue that whether or not Breuer's statement to Der Spiegel was true, he lacked scienter because he did not know of any "talk of any takeover," even if such talk had occurred.

In the context of the securities fraud statutes, scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996) (citations omitted). *See also SEC v. Todt*, No. 98 Civ. 3980, 2000 WL 223836, at *9 (S.D.N.Y. Feb.25, 2000), *aff'd*, 7 Fed.Appx. 98 (2d Cir.2001). Scienter may be inferred from proof of "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" or from proof that a defendant had "both motive and opportunity to commit fraud." *Rothman*, 220 F.3d at 90; *see also Kalnit*, 264 F.3d at 138; *Chill*, 101 F.3d at 267. An "egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Novak v. Kasaks*, 216 F.3d 300,

---

**2.** A chronology prepared by Deutsche Bank's outside counsel in response to a New York Stock Exchange inquiry, which is admissible under Fed.R.Evid. 801(d)(2)(D), also indicates that at the October 5 meeting Breuer and Newman discussed "the possibility of some sort of business combination" between the banks. (Pl.App., Ex. 27 at X 22292.)

308 (2d Cir.2000) (alteration in original) (punctuation omitted) (quoting *Chill,* 101 F.3d at 269). Accordingly, liability can arise where a defendant "should have known that [the defendant was] misrepresenting material facts related to the corporation...." *Novak,* 216 F.3d at 308 (2d Cir.2000).

The element of scienter "is generally a question of fact, appropriate for resolution by the trier of fact." *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir. 1999) (punctuation omitted) (citing *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 194 (2d Cir.1998)). Thus, even scienter issues based on "fairly tenuous inferences" may survive summary judgment. *Press,* 166 F.3d at 538.

In this case, if a jury found that Breuer's statement was untrue or materially misleading, it could also find that he was conscious of its falsity. Breuer himself testified that in the October 5, 1998 meeting—more than two weeks before the Der Spiegel interview—the range of possible agreements that he was trying to gauge Newman's interest in included a complete financial merger of the banks. (Pl.App., Ex. 4 at 82.) In addition, de Ballman's notes and testimony of his July 15 telephone conversation with Mitchell indicate that Breuer knew about that phone call, which could be construed as contemplating a merger or acquisition. (Pl.App., Ex. 82 & Ex. 6 at 53.) And the events of September and October could be viewed as a resurrection of the takeover talk after Bankers Trust stock had dropped precipitously.

The plaintiffs have also identified evidence which, construed most favorably to them as required on this motion, could support a jury's conclusion that if Breuer did not know of "talk of any takeover," he was reckless in not knowing about such talk. *Cf. SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (scienter "may be estab-

lished through a showing of reckless disregard for the truth"). Goldman Sachs prepared materials for Breuer for his October 5 meeting with Newman which discussed a Deutsche Bank acquisition of Bankers Trust, although Breuer denies seeing the detailed script. (Pl.App. Ex. 21 at 163 & Ex. 56.) Wilson has testified that he discussed a takeover with Newman and Goldstein after the October 5 meeting but before the Der Spiegel interview. (Pl.App. Ex. 22 at 70, 72–77, 81, 85–86.) There are issues of fact as to whether the details of Wilson's discussions rose to the level of talk of any takeover, and whether such detailed talks were authorized and whether Breuer knew or should have known that the investment banker he had hired was engaged in such talks, particularly in view of the fact that Breuer had personally taken charge of the process. (Pl.App., Ex. 17 at 174.)

Finally, although they claimed not to rely on their extremely narrow translation of the phrase "Übernahmegespräche" at oral argument, the defendants went on to argue that Dr. Breuer indisputably lacked scienter as long as he was using a reasonable definition of the word when he spoke, and the definition comported with the facts. The defendants' definition of "Übernahmegespräche" requires that there be formal and structured talks between business organizations contemplating a purchase of one by the other, accompanied by an exchange of confidential information. Even if this is a reasonable definition, the defendants' argument must still fail. As noted above, Dr. Breuer's testimony can support a finding that he was in fact using the word in the sense the plaintiffs define it, and a jury would not be required to credit any testimony that Breuer was using the term only in the narrow sense most helpful to the defendants' position. Furthermore, a jury could find that Dr. Breuer knew that the

statement was misleading because he knew that the phrase "Übernahmegespräche" would be interpreted in a broad sense, as indeed it was by Deutsche Bank itself (Pl.App., Ex. 78) and financial journalists (Pl.App., Ex. 106). Finally, even the cases on which the defendants rely acknowledge that recklessness with respect to allegedly misleading statements can satisfy the scienter requirement. *See, e.g., Geffon v. Micrion,* 249 F.3d 29, 35, 37–38 (1st Cir.2001); *In re Apple Computer Sec. Litig.,* 690 F.Supp. 872, 877 (N.D.Cal.1987), *rev'd in part on other grounds,* 886 F.2d 1109 (9th Cir.1989). A jury in this case could find that Breuer was reckless in not knowing the inaccurate or materially misleading import of his words.

Alternatively, the plaintiffs have also shown that there are material issues of fact concerning whether Breuer acted with scienter based on his motive and opportunity to make an inaccurate or materially misleading statement about the status of talks of any takeover. Following media reports of such talks, Bankers Trust stock had increased significantly in value. Breuer was aware of the media reports (Pl.App., Ex. 4 at 116), and had a motive to depress the price of Bankers Trust stock prior to the determination of the acquisition price. Breuer also had the opportunity to do so, as reflected by the immediate decrease in the price of Bankers Trust stock following publicity about the interview.

In this case, scienter remains a disputed issue of material fact that must be decided by the finder of facts.[3]

# IV

## A

■ The plaintiffs move for partial summary judgment on the issue of liability, arguing that the materiality, scienter, reliance, and causation elements of their claim are established beyond dispute, and that Breuer's statement was incontrovertibly a false statement or omission.

A false or incomplete statement does not give rise to liability if "the misrepresented fact is otherwise insignificant." *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 231–32, 108 S.Ct. 978 (punctuation omitted). The fact that a company has received an acquisition overture or that some discussion has occurred "will not necessarily be material." *Castellano,* 257 F.3d at 185 (citing *Glazer v. Formica Corp.,* 964 F.2d 149, 155 (2d Cir.1992)). "When contingent or speculative events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Castellano,* 257 F.3d at 180 (punctuation omitted) (quoting *Basic,* 485 U.S. at 238, 108 S.Ct. 978).

Courts should "assess the probability of an event by looking at the 'indicia of interest in the transaction at the highest corporate levels' and by considering, *inter alia,* 'board resolutions, instructions to investment bankers, and actual negotiations be-

**3.** Defendant Deutsche Bank argues that it is entitled to summary judgment because it cannot be established that Breuer acted with scienter. However, because there are disput- ed issues of material fact as to Breuer's scienter, summary judgment also cannot be granted to Deutsche Bank.

tween principals or their intermediaries...as indicia of interest.' Whether merger discussions in any particular case are material or immaterial will normally depend on the facts of the case." *Glazer,* 964 F.2d at 155 (citation omitted) (alteration in original) (quoting *Basic,* 485 U.S. at 239, 108 S.Ct. 978). "No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." *Basic,* 485 U.S. at 239, 108 S.Ct. 978. Instead, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id* at 240, 108 S.Ct. 978.

There is undoubtedly evidence in the record that could be construed as indicia that Deutsche Bank's management was interested in a merger with Bankers Trust. Discussions between the banks' top executives, their retention of sophisticated investment advisors and lawyers, and their preparation of financial analyses tend to support an argument that there was some probability of a merger. However, there is also evidence in the record to support the defendants' contention that talks were in an early and exploratory stage which had yet to even focus on merger as a possible outcome, and that the parties had not yet proceeded to the exchange of confidential information and the intense due diligence process during which any possible deal may have foundered. (*See, e.g.,* Pl.App. Ex. 4 at 117 (Breuer's testimony that talks were still in "a very exploratory stage").) In addition, to the extent that the plaintiffs attempt to establish materiality by pointing to Wilson's efforts as a "go-between," both Wilson (Pl.App., Ex. 22 at 198) and Breuer (Pl.App., Ex. 4 at 66) have testified that Wilson did not have the authority to negotiate on behalf of Deutsche Bank.

The issue of materiality in this case cannot be resolved on a motion for summary judgment. Moreover, construing the evidence in the light most favorable to the defendants as the Court is required to do on the plaintiffs' motion for summary judgment, there are plainly issues of material fact with respect to scienter and the truthfulness of Breuer's statement.

### B

The plaintiffs have also moved for partial summary judgment on their claim brought against defendant Breuer pursuant to § 20(a) of the Exchange Act.

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. To make out a prima facie case under § 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *First Jersey,* 101 F.3d at 1472 (quotations and internal alterations omitted).

The plaintiffs have failed to demonstrate that they are entitled to summary judgment on their claim that there has been a violation of Section 10(b) of the Act. Thus, for purposes of their motion for summary judgment, they have proven no primary violation on which a § 20(a) claim could be based. Their motion for summary judgment on this claim must therefore fail. *See In re Hudson Techs., Inc. Sec. Litig.,*

No. 98 Civ. 1616, 1999 WL 767418, at *13 (S.D.N.Y. Sept. 28, 1999).

### Conclusion

For the reasons explained above, the defendants' motion for summary judgment and the plaintiffs' motion for partial summary judgment are denied.

SO ORDERED.